KEMNITZER, BARRON, & KRIEG, LLP
BRYAN KEMNITZER Bar No. 066401
NANCY BARRON Bar No. 099278
ADAM J. McNEILE Bar No. 280296
KRISTIN KEMNITZER Bar No. 278946
445 Bush St., 6th Floor
San Francisco, CA 94108
Telephone: (415) 632-1900
bryan@kbklegal.com
nancy@kbklegal.com
adam@kbklegal.com
kristin@kbklegal.com

LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
IAN LYNGKLIP Bar No. P47173
PRIYA BALI Bar No. P78337
24500 Northwestern Hwy., Ste. 206
Southfield, MI 48075
Telephone: (248) 208-8864
ian@michiganconsumerlaw.com
priya@michiganconsumerlaw.com
*Attorneys for Plaintiffs Aram Terteryan, Tatyana Davtyan, Marine Davtyan, and the putative class*

SCOTT J. HYMAN (State Bar No. 148709)
sjh@severson.com
GENEVIEVE R. WALSER-JOLLY (State Bar No. 262784)
grw@severson.com
ALAN M. RITCHIE (State Bar No. 298989)
amr@severson.com
SEVERSON & WERSON
A Professional Corporation
The Atrium
19100 Von Karman Avenue, Suite 700
Irvine, California 92612
Telephone: (949) 442-7110
Facsimile: (949) 442-7118

DUANE M. GECK (State Bar No. 114823)
dmg@severson.com
MARK D. LONERGAN (State Bar No. 143622)
mdl@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant
NISSAN MOTOR ACCEPTANCE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

| | |
|---|---|
| ARAM TERTERYAN, TATYANA DAVTYAN, and MARINE DAVTYAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  vs.<br><br>NISSAN MOTOR ACCEPTANCE CORPORATION,<br><br>        Defendant. | Case No. 2:16-cv-02029 GW (KSx)<br>Hon. George H. Wu<br>Ctrm. 9D – 1st Street<br><br>**CLASS ACTION**<br><br>**LOCAL RULE 37-2 JOINT STIPULATION RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION AND INSPECTION**<br><br>Date:   TBD<br>Time:   TBD<br>Ctrm.:  TBD<br><br>Action Filed:  March 24, 2016<br>Trial Date:    None Set |

**Table of Contents**

I. INTRODUCTORY STATEMENTS................................................................3
    A. Plaintiffs' statement. ...............................................................................3
    B. NMAC's Introductory Statement.............................................................5
II. STANDARD OF REVIEW ..........................................................................8
    A. Plaintiffs' position..................................................................................8
    B. NMAC's Position – Not permissible under Local Rule 37-2 but see
    discussion in Sections VI.B. and VII.B below. ...........................................8
III. PLAINTIFFS' PROCESS TO ASSEMBLE CLASS LIST, IDENTIFY
COMMON PROOFS, AND CALCULATE DAMAGES. .....................................8
    A. Plaintiffs' position..................................................................................8
    B. NMAC's Position -Not permissible under Local Rule 37-2 but see
    discussion in Sections VI.B. and VII.B below. .........................................10
IV. THE DISCOVERY REQUESTS AND OBJECTIONS AT ISSUE. ..............10
    A. Plaintiffs' position and summary of the discovery at issue. .................10
        1. Plaintiffs has requested documents and data necessary to the formation of
        a class (RTP 49, 52, 53, and 54).......................................................10
        2. Plaintiffs have requested documents that are relevant to establishing that
        Defendants used an ATDS and prerecorded voice. (RTP 49, 51, 53, 56, and
        57) 11
        3. Plaintiffs have requested documents and data relevant to establishing the
        number of calls and prerecorded voice messages delivered to the class
        members. (RTP 49, 53 and 54)........................................................11
        4. Plaintiffs have requested documents and data necessary to establish
        willfulness, (RTP 49, 51, 52, 53, 54, 56, 57, and 60).........................12
        5. Plaintiffs have requested documents necessary to test the affirmative
        defenses of consent in this case. (RTP 49, 52, and 54) .....................12
        6. The inspection and data sampling of NMAC's Systems is necessary to
        determine if a class list can be assembled (Exhibit 3).......................13
    B. NMAC's Position – Not permissible under Local Rule 37-2 but see
    Discussion of The Requests And Responses At Issue Below. ......................13
V. AVAILABILITY OF DATA AND DOCUMENTS AT ISSUE. ....................13
    A. Plaintiffs' Position................................................................................13
    B. NMAC's Position – Not permissible under Local Rule 37-2 but see
    discussion in Sections VI.B. and VII.B below. .........................................16
VI. SHOULD THE COURT OVERRULE NMAC'S OBJECTIONS TO
PRODUCTION AND INSPECTION?...............................................................16
    A. Plaintiffs' Position................................................................................16
        1. Undue Burden – The burden of production in response to Requests 49, 51,
        52, 53, 54, 56, 57 and 60 is neither undue nor disproportionate to the needs of
        the case...........................................................................................16

06888.0238/10896402.1

1

LR 37-2 JOINT STIPULATION RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION AND INSPECTION.

2.   Overbreadth – Requests 49, 52, 53, 54, 56, 57, and 60 are reasonably tailored to assemble a class list, measure class damages, identify common issues, and identify individual class members...................................................21

3.   GLBA and Privacy -- Requests 49, 51, and 54 do not require NMAC to violate the Gramm-Leach Bliley Act, and any minimal invasion of privacy can be ameliorated through a protective order.........................................................26

4.   Privilege --  NMAC has not properly asserted its claims of privilege concerning its TCPA compliance audits ........................................................29

5.   Confidentiality – NMAC has failed to identify any information requiring protection beyond the protective order issued in this case. ...............................29

B.   NMAC's Position..............................................................................................30

1.   Request 49............................................................................................30

2.   Request 51............................................................................................42

3.   Request 52............................................................................................42

4.   Request 53............................................................................................43

5.   Request 54............................................................................................43

6.   Request 56 and 57................................................................................43

7.   Request 60............................................................................................43

VII.   PROPOSED RESOLUTIONS. .....................................................................44

A.   Plaintiffs' proposed resolution. ........................................................................44

1.   Request 49............................................................................................44

B.   NMAC's Proposed Resolution (as to Plaintiffs' Request for Inspection)....46

VIII.   CONCLUSION .............................................................................................51

A.   Plaintiffs' position ............................................................................................51

B.   NMAC's Position - Not applicable under Local Rule 37-2but see discussion in Sections VI.B. and VII.B above. .......................................................................52

**JOINT BRIEF**

**I.    INTRODUCTORY STATEMENTS**

    **A.    Plaintiffs' statement.**

Plaintiffs Aram Terteryan, Marine Davtyan, and Tatyana Davtyan (together, "Plaintiffs") brought this case as a class on behalf of non-customers of NMAC who NMAC targeted with prerecorded messages or autodialed calls to their cell phones. The requests at issue (Requests To Produce ("RTP") 49, 51, 52, 53, 54, 56, 57, and 60, and Plaintiffs' Request for Inspection to Data Sample ("RFI")) seek this class information, along with evidence of willfulness, common proofs, and NMAC's defense of consent. NMAC has conceded the numerosity of the proposed class for purposes of Fed. R. Civ. Proc. 23(a)(1).

Plaintiffs have sought a list of individuals NMAC called using an automatic dialer or prerecorded voice, along with the number of calls and circumstances of the calls. Plaintiffs would then subpoena cellular carriers for subscriber information, which will permit Plaintiffs to filter out NMAC's customers and landline users, leaving only a list of non-customers who received calls and prerecorded messages to their cell phones. This will result in a class list. Plaintiffs can then use NMAC's records to measure damages and identify common proofs relating to the class claims.

NMAC does not deny that it maintains electronic records of the phone numbers of non-customers or its robocalling activity. Rather, NMAC argues that it does not routinely maintain information on non-customers in a segregated format, and that it cannot identify non-customers without a manual review which would represent an "undue burden." And, even if it could assemble this information, NMAC claims that disclosing this list would violate the privacy of the non-customers alike. Consequently, NMAC has resisted all requests to compile a class list or disclose its calling activity. In short, NMAC has delivered no data concerning the class members or its calls, and has stated it does not itself have the means of

identifying these critical proofs in advance of class certification and mediation. Having violated class members' privacy through unwanted calls and messages, NMAC now seeks to champion those class members' rights by ensuring that no class is certified and no remedy obtained.

At core, this motion seeks to compel NMAC to either (1) compile a class list from its existing electronic records or (2) permit Plaintiffs to access NMAC's data so that Plaintiffs can assemble the list using their own experts at their own expense.

Prevailing law establishes that Plaintiffs may obtain precertification discovery where the information sought relates to class issues.  Additionally, case law provides Plaintiffs with equal access to this information, which rests exclusively in NMAC's possession, so that Plaintiffs may contact class members as fact witnesses concerning their experiences with a defendant, determine common proofs, prove willfulness, or establish elements of the case.  To the extent that Plaintiffs' requests can be satisfied through NMAC's call logs, case law holds that phone numbers are not private information, and NMAC may disclose this information – even if confidential – under the auspices of a discovery request.  To the extent that Plaintiffs' requests seek personal identifiers, case law deems the invasion as minimal, and the Court may ameliorate that invasion through the issuance of a protective order providing adequate safeguards.

The reasonably tailored requests at issue seek only the information required for certification. While the record evidence reveals no burden to NMAC in disclosing this information, the Court may vitiate any cost to NMAC by permitting Plaintiffs to directly access this data, and extract it at their own expense. Consequently, the burden in this case is neither undue nor disproportionate to the needs of the case and the Court should compel the requested discovery.

### B.   NMAC's Introductory Statement

Plaintiffs filed this lawsuit in March 2016 alleging that NMAC used an autodialer to call them on their cell phones without their consent, in violation of the TCPA.  For two of the three plaintiffs, their cell phone numbers were provided to NMAC by its customer as a means of contacting that customer; the question of whether NMAC had consent to call these plaintiffs is hotly disputed.  Plaintiffs seek to represent a class of other non-customers of NMAC who were called using an autodialer.  The implicit premise of Plaintiffs' lawsuit is that NMAC could never have consent to call a non-customer, so all such calls must violate the TCPA.

Plaintiffs have conducted *extensive* discovery over the year and a half this case has been pending.  Almost all of that discovery has been focused on trying to find a way to identify the universe of non-NMAC customers who comprise the class.  This discovery has included numerous depositions of NMAC IT personnel, subpoenas to third party vendors/telecommunications providers such as Verizon and Genesys, and voluminous written discovery requests to NMAC.

NMAC's position has remained consistent from the beginning of this case to the present:  It cannot identify non-customers who are members of the class alleged by Plaintiffs because its records do not identify the "called party," that is, the person who answered the call placed by NMAC.  Because NMAC contacts its customers using the telephone numbers they themselves provide, the vast majority of calls or texts by NMAC are received by its customers, who consented to receipt of the call.  However, to the extent a non-customer may have received a particular call, there is no way to identify that person from the information found in NMAC's data.

Plaintiffs have refused to accept the fact that non-customers cannot be identified from NMAC's records, and they have repeatedly changed their proposed method for identifying the class.  Their current proposed methodology is set forth in their introductory statement and Section III.A of this motion:  They want to obtain records of all numbers called by NMAC using an autodialer, subpoena third party

cell phone carriers to determine which of those numbers were cell numbers, ask these carriers to identify the subscriber for each phone number, and then determine if that subscriber is an NMAC customer (which would require the service of more discovery later in the case).

Plaintiffs' proposal remains fatally flawed. The first step would require a vastly overbroad production of phone numbers of millions of NMAC customers who are, by definition, ***not*** class members, violating their privacy rights. Daley Dec. ¶6. The entire process is cumbersome, burdensome and unworkable. Indeed, Plaintiffs have already served an overbroad subpoena on a single carrier, Verizon, to carry out the first step of their plan, and Verizon produced nothing. And even if Plaintiffs' efforts met with some success, the best they could hope to come up with is a partial list of cell phone subscribers who are not themselves NMAC customers. But the customary user of that cell phone number (family member, employee of the subscriber, etc.) would very likely have been the NMAC customer and recipient of the call—and customary users are indisputably able to consent to the receipt of autodialed calls. *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15 72, 30 F.C.C.R. 7961, ¶ 72 (July 10, 2015).

In a reflection of their frustration, Plaintiffs have now filed this "kitchen sink" motion to compel in which they seek every type of data or information NMAC possesses concerning all calls placed on its customers' accounts. This discovery includes document requests that are facially overbroad, burdensome and violative of NMAC's customers' right to privacy, and even a request to inspect and extract highly confidential customer data from NMAC's servicing system and databases. Plaintiffs summarize some of the information they have obtained over a year and a half of discovery, and say this information proves a class list can be compiled from NMAC's data—but in fact, it cannot. As set forth below in its discussion of the particular requests at issue, each request is defective for multiple reasons, and this entire exercise is not reasonably designed to yield the class list Plaintiffs seek.

Further, Plaintiffs' motion blatantly violates this Court's rules and it should be denied for that reason as well. Under Local Rule 37-2, the stipulation prepared by Plaintiffs was required to set forth each disputed discovery request verbatim, followed by Plaintiffs' contentions and authorities as to why a further response should be compelled. Incorporation by reference of other documents is specifically prohibited. The point of these requirements is to provide the Court with a clear and concise statement, first by the moving party and then by the responding party, of the parties' respective factual and legal positions regarding the particular request at issue. *Id.*; *see also California Federal Civil Rules*, Central District, Rule 37, Author Commentary (Matthew Bender).

Plaintiffs have ignored these requirements. Neither the disputed discovery requests nor NMAC's answers are quoted verbatim. Instead, they are attached as exhibits, forcing both the Court and NMAC to cross-reference material from other documents. While the parties are limited to a single, three page "introductory statement" by Local Rule 37-2, Plaintiffs have scattered various legal arguments throughout the stipulation. In these unauthorized insertions Plaintiffs purport to describe the standard of review (Section II.A); set forth their currently proposed plan for identifying class members (Section III.A); "summarize" the discovery they have propounded (Section IV.A); recap (and mischaracterize) the information they say they have obtained in discovery to date (Section V.A); and, set forth their proposed resolution (Section VI.A).

As a result of this approach, this stipulation is exceptionally long and unfocused. It lacks the self-contained discussion of the parties' respective positions on each request at issue that is required under Local Rule 37-2. Rather than reciprocate by adding its counter-arguments to each of Plaintiffs' unauthorized sections, NMAC's portion of this stipulation below will include a single discussion of each request at issue in which it attempts to address all of the various arguments Plaintiffs have made as to why a further response is required.

## II.    STANDARD OF REVIEW

### A.    Plaintiffs' position.

The decision to permit precertification discovery "lies within the sound discretion of the trial court." *Kamm v. Cal. City Dev. Corp.*, 509 F.2d 205, 209 (9th Cir. 1975); *accord Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).  "In determining whether to grant discovery, the court must consider its need, the time required, and the probability of discovery resolving any factual issue necessary for the determination[ ]" of whether a class action should be maintained. *Kamm*, 509 F.2d at 210.   The plaintiff bears the burden of advancing a *prima facie* showing that the requested discovery is likely to produce substantiation of the class allegations. *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985, as amended Aug. 27, 1985).  Once the plaintiff has demonstrated that discovery is necessary or helpful to class certification, it is an abuse of discretion to deny precertification discovery. *Id*. (citing *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir.1977)). "Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion." *Id.* at 1424 (citing *Doninger*, 564 F.2d at 1313).

### B.    NMAC's Position – Not permissible under Local Rule 37-2 but see discussion in Sections VI.B. and VII.B below.

## III.    PLAINTIFFS' PROCESS TO ASSEMBLE CLASS LIST, IDENTIFY COMMON PROOFS, AND CALCULATE DAMAGES.

### A.    Plaintiffs' position.

As the parties prepare for class certification briefing and class-wide mediation,[1] Plaintiffs' counsel continues to seek information to substantiate the class allegations and determine a class list, class damages, common proofs, and the identity of class members.  In light of the NMAC's stipulation of numerosity, the

---

[1] The deadline for Plaintiffs to file their Motion for Class Certification is October 20, 2017.

core issue for certification and settlement revolve around whether the parties can identify class members and assemble a class list.

Based upon the information gathered at the deposition of NMAC's 30(b)(6) witnesses, NMAC possesses:

- complete data identifying the date, time and target number of all the calls which it initiated from its autodialer over at least the last five years,
- defined rules for delivery of prerecorded messages and sufficient data to identify all the prerecorded messages left to each class member, and
- the identity of each phone number added to its system after the opening of its account and notes describing the circumstances under which these numbers were added to its system.

Because NMAC stores this information in electronic databases, ESI experts can manipulate this data into a format that can be queried and searched by algorithms to produce a list of non-customers called by NMAC, along with a calculation of damages sustained by each class member.

Plaintiffs have requested that NMAC compile this information from its retained data. (RTP 49). As an alternative means of assembling this list, Plaintiff has also requested that that NMAC produce its raw data of calls initiated by NMAC's autodialer. (RTP 54). Failing that, Plaintiffs have requested that NMAC permit inspection of its SIEBEL customer relations management system and the GENESYS dialing system to extract this information. (Defendant's Response to Plaintiffs Request for Inspection, Exhibit 3.) The first method would require data processing by NMAC, the second method would require NMAC to produce its raw data and shift the cost of assembling the class list to Plaintiffs. The last method would only require that NMAC provide access to its system for a non-destructive extraction of data.

Using any of these methods, Plaintiffs would then subpoena cellular carriers to learn the identity of the subscribers called and whether the numbers called were cell phones.[2]  By cross referencing the results of that subpoena against NMAC's list of account holders, Plaintiffs can identify the non-customers who are members of the class and then use NMAC's calling data to calculate class damages.  If necessary, the Court and Counsel can verify membership in the class through a number of means which have been approved by other courts, such as data sampling, claim forms, surveys, reverse append lists of cellular users, and manual review of free text data.  The precise means of any crosscheck would depend upon the number of class members identified through the comparison of NMAC's customers and cellular subscribers.

**B.      NMAC's Position -Not permissible under Local Rule 37-2 but see discussion in Sections VI.B. and VII.B below.**

## IV.    THE DISCOVERY REQUESTS AND OBJECTIONS AT ISSUE.

The parties request that the Court resolve their dispute over the discoverability of the following two sets of production requests. These requests and the objections are attached as Exhibits 2 and 3.  A summary follows.

**A.      Plaintiffs' position and summary of the discovery at issue.**

**1.      Plaintiffs has requested documents and data necessary to the formation of a class (RTP 49, 52, 53, and 54)**

Plaintiffs are representing a putative class of persons whom NMAC called using an ATDS or prerecorded voice on their cellular telephones without having first provided consent. Necessarily, to represent this putative class, Plaintiffs have to reasonably identify who else NMAC called using an ATDS or prerecorded voice without consent. Plaintiffs' RTPs are relevant to identifying the putative class, as they request (1) the data that would identify each of the non-customer phone numbers NMAC called using an ATDS or prerecorded voice (RTP 49); (2) how

---

[2] *See* Declaration of Lyngklip.

many times NMAC called each of these numbers using an ATDS or prerecorded voice (RTP 49); (3) whether the recipient of the call consented to the call or prerecorded voice or requested that the calls stop (RTP 49, 52, 55) (4) the standardized procedures by which the calls were placed (RTP 53); (5) and how NMAC originally obtained the numbers it dialed (RTP 54).

Each of these requests is specifically tailored to assist Plaintiffs in compiling a class of persons who they are seeking to represent.

**2.    Plaintiffs have requested documents that are relevant to establishing that Defendants used an ATDS and prerecorded voice.  (RTP 49, 51, 53, 56, and 57)**

One of the elements of an action brought pursuant to the TCPA is that the calls are made using an ATDS or prerecorded voice. 47 U.S.C. §227(b)(1)(A). Therefore, any documents that would demonstrate whether NMAC utilizes an ATDS or prerecorded voice are unquestionably relevant to Plaintiffs' claims. Plaintiffs have propounded requests on NMAC that seek this exact information, including (1) whether NMAC used an ATDS or prerecorded voice to call Plaintiffs and putative class members' cellular telephones (RTP 49, 53); (2) whether NMAC registers its phone systems with the State of Texas as an Automatic Dial Announcing Device (RTP 51); and (3) whether NMAC has been investigated or audited regarding its use of an ATDS or prerecorded voice (RTP 56, 57).

**3.    Plaintiffs have requested documents and data relevant to establishing the number of calls and prerecorded voice messages delivered to the class members.  (RTP 49, 53 and 54)**

The total number of calls and prerecorded voice messages that NMAC made to members of the putative class is highly relevant to Plaintiffs' and putative class members' damages. The remedy for violating the TCPA is $500 per call, or up to $1,500 per call if the violation was willful. 47 U.S.C. §227(b)(5)(C). RTPs 49 and 53 request documents sufficient to demonstrate the total number of calls and prerecorded voice messages NMAC made to members of the putative class.

**4.    Plaintiffs have requested documents and data necessary to establish willfulness, (RTP 49, 51, 52, 53, 54, 56, 57, and 60)**

The remedy for violations of the TCPA is contingent on whether the defendant's actions were willful or not. 47 U.S.C. §227(b)(5)(C). Therefore, the pervasiveness of NMAC's violations of the TCPA as well its business practices and systems are relevant to Plaintiffs' claims. To determine whether NMAC's violations of the TCPA were willful, Plaintiffs have requested that NMAC produce documents demonstrating (1) the total number of times it called persons using an ATDS or prerecorded voice without their consent (RTP 49); (2) whether NMAC uses an ATDS or prerecorded voice (RTP 49 and 51); whether NMAC obtained consent prior to dialing persons' cellular telephones, how it obtained the numbers it dialed in the first place, and whether and when any person requested that NMAC cease making calls (RTP 49, 52, and 54); (3) NMAC's business rules and instructions concerning its use of an ATDS or prerecorded voice in its dialing campaigns (RTP 53); and (4) whether NMAC previously had any audits or investigations conducted concerning its use of an ATDS or prerecorded voice (RTP 56, 57).   Finally, Plaintiffs seek the organizational chart for NMAC to identify individuals within NMAC's corporate structure who are likely responsible for its policies procedures and practices in relation to autodialing and delivery of prerecorded messages.

Each of these documents is reasonably tailored to obtain information which bears on the issue of willfulness, and a does so with reasonable specificity.  As such, the Court should require NMAC to produce responsive documents and data.

**5.    Plaintiffs have requested documents necessary to test the affirmative defenses of consent in this case. (RTP 49, 52, and 54)**

NMAC has variously claimed that it either had consent to dial Plaintiffs' numbers or did not require consent at all to call them. Because NMAC claims consent as an affirmative defense (R. 43 at PgID 225), Plaintiffs have requested NMAC's records that would demonstrate whether, in fact, NMAC did have consent

from the called parties.  The absence of this information would tend to establish that NMAC had no consent, particularly where the FCC and courts have placed the burden of proving consent on NMAC.  Therefore, Plaintiffs have requested (1) a compilation of the individuals who NMAC called along with the date of their consent, the evidence that NMAC will rely on (R. 52) and all the source records establishing that consent (R.54)  These requests all bear upon the issue of NMAC's affirmative defense and have been identified with reasonable specificity.  As such, these records are relevant to facts at issue and the Court should require NMAC to produce responsive documents and data.

> **6.** **The inspection and data sampling of NMAC's Systems is necessary to determine if a class list can be assembled (Exhibit 3).**

NMAC has repeatedly objected to the burdens associated with manual review of it own data.  Plaintiffs seek to inspect NMAC's systems at their own expense and effort to determine whether NMAC's own data can be used to identify the numbers of third parties called by NMAC using its autodialer and prerecorded messages. Plaintiffs seek to compile that list, along with data concerning the frequency of calls and messages.  The very data that Plaintiffs need to do so is housed within NMAC's possession on NMAC's servers. As such, the requests seek relevant data, and identify the production with reasonable specificity.  The Court should permit the inspection of these systems and allow data extraction.

> **B.** **NMAC's Position – Not permissible under Local Rule 37-2 but see Discussion of The Requests And Responses At Issue Below.**

## V.   AVAILABILITY OF DATA AND DOCUMENTS AT ISSUE.

### A.   Plaintiffs' Position.

Following the depositions of three Rule 30(b)(6) witnesses and the manager of the NMAC Information Services team, the parties have determined the following concerning the availability of data at issue.

The record evidence establishes that that much of the data requested lies in two log files generated by NMAC's communications systems.  1) The Genesys DAT Logs represent a complete log of all dialing activity of the Genesys system, which the Genesys system compiles on a daily basis, and which is stored in the NMAC Q Drive for a period of at least five years.  This log contains the phone numbers dialed by the Genesys system along with the account numbers.  Second, the PBX Log logs all calling traffic going through the phone systems in the NMAC facility in Dallas, including outbound calls made by the Genesys dialer and information concerning the delivery of prerecorded messages and the numbers which those messages were delivered to.  Additionally, the SIEBEL Contacts table tracks all changes to phone numbers, such as the addition of phone numbers to client accounts following unsuccessful attempts to reach an NMAC customer. Plaintiffs believe that many, if not all, class members will share this attribute.[3]

- ✓ Throughout the class period, NMAC operated an autodialing system known as Noble over its Genesys telecommunications system.   (Matt Ramsey at 70: 10-23)

- ✓ NMAC maintains records concerning its customers' accounts and communications with those customers in its SEIBEL system, which is published by Oracle.   (Matt Ramsey at 115: 13-18; Megan Newman at 63: 7-18)

- ✓ SEIBEL operates in an Oracle SQL database environment.  (Mark St. Peter declaration)

- ✓ On a nightly basis, NMAC backs up a copy of its SEIBEL database to the Noble system in order to allow NOBLE to identify calls to be made on the following day.   (Matt Ramsey at 122: 4-21)

- ✓ NOBLE uses predetermined rules to contact NMAC customers who are in various stages of default.  (Matt Ramsey at 52: 13-18; NMAC 000458)

- ✓ NMAC maintains a log file containing data describing all calls placed by the Genesys-Noble autodialing system.  These log files are referred to as "DAT log" files by the manager of autodialing services, Matt Ramsey. (Matt Ramsey at 125-128)

---

[3] NMAC added phone numbers for two of the class representatives' (Marine and Tatyana Davtyan) to its customer's contact information in its Seibel system following unsuccessful attempts to reach NMAC's customer.

✓ The DAT logs are created by the G-Adapter feature of the Genesis-Noble dialer system.  (Matt Ramsey at 125: 18-24, 126: 1-17)

✓ The DAT Logs are stored for five years.  (Matt Ramsey at 127: 15-16)

✓ The DAT Logs contain the following data concerning calls placed:  The date, the time, the account number, the phone number, and the dialer result code associated with the call.  (Matt Ramsey at 129-130)

✓ NMAC has consistently used the same rules for leaving prerecorded messages over the preceding five years.  Those rules require the Genesys-Noble system to deliver a prerecorded message in the last call of the day on each account.  (Matt Ramsey at 151: 1-25)

✓ The DAT Logs contain sufficient information to identify the date and time of prerecorded messages left by NMAC, using NMAC's rules for delivery of prerecorded messages by NMAC's Genesis-Noble dialer. (Matt Ramsey at 125: 6-24, 129: 23-25, 155: 17-22, 167: 15-23)

✓ The DAT Logs can be read by MS Excel (Matt Ramsey at 136: 7-25, 137, 138).

✓ The DAT Logs are maintained in a single directory (the "BTTC" directory) on NMAC's Q drive which is accessible to Matt Ramsey.  (Matt Ramsey at 128-129)

✓ NMAC also maintains a separate log of all calling activity through its PBX, over its phone lines within and without the build.  The log is referred to as a "PBX Log."   (Matt Ramsey at 130-131).

✓ The PBX log contains data concerning the dates and times phone recipients of prerecorded messages delivered by the Genesis-Noble system.  (Matt Ramsey at 119: 17-25).

✓ When NMAC learns that a customer can be reached through a third party and provides that third party's number, NMAC's agents add that number to its SEIBEL system in the fields reserved for customer contacts.  (Matt Ramsey at 173: 19-25, 174: 1-23; Megan Newman at 26-27, 102).

✓ NMAC does not question whether there is consent for calls beyond the fact that the customer has provided the number.  (Matt Ramsey at 30: 5-25, Megan Newman at 26-27, 102).

✓ NMAC maintains data table within its SEIBEL system that track changes to address and phone information known as the "Contacts" table.  (Matt Ramsey at 65: 10-17).

✓ Most major customer relations databases track phone number changes in a table associated with address.  (Declaration of Mark St. Peter, Exhibit 4).

✓ The Contacts table that contains the information concerning changes to phone information which is made available to the Genesis-Noble autodialer. (Matt Ramsey at 65-66).

✓ Changes to the Contacts table and can be output to an Excel readable file (Matt Ramsey at 101: 3-21).

✓ NMAC documents changes to the Contacts table in its Seibel notes (Matt Ramsey 67: 1-4).

✓ The Seibel notes, along with it the corresponding date and account information can be output to an Excel readable file.  (Matt Ramsey Deposition at 84.)

✓ NMAC maintains an organizational chart which it makes available to its employees.   (Matt Ramsey at 179: 21-25, 180: 1-10; Eileen Fukyama at 39: 18-25, 40: 1-18).

✓ Eileen Fukyama supervises a team that writes business rules.  (Matt Ramsey at 46: 14-25, 47: 1-4; Eileen Fukyama at 19: 6-8)

✓ Matt Ramsey operates a system that uses business rules and understands what they are.  (Matt Ramsey at 22: 1-19, 49: 8-25)

Using subpoenaed information from cellular carriers, Plaintiffs' experts can uses this information to cross reference those names against NMAC customer list to identify the individuals who received dialer calls and prerecorded messages and were not NMAC customers.

**B.**     **NMAC's Position – Not permissible under Local Rule 37-2 but see discussion in Sections VI.B. and VII.B below.**

## VI.   SHOULD THE COURT OVERRULE NMAC'S OBJECTIONS TO PRODUCTION AND INSPECTION?

**A.     Plaintiffs' Position.**

**1.     Undue Burden – The burden of production in response to Requests 49, 51, 52, 53, 54, 56, 57 and 60 is neither undue nor disproportionate to the needs of the case.**

NMAC has objected to nearly all of Plaintiffs' discovery requests on the grounds of undue burden.    The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information. *Kawamura v. Boyd Gaming Corp.*, 2014 WL 3953179, at \*6 (D. Nev. Aug. 13, 2014); *Cabasug v. Crane Co.*, No. CV 12-00313

JMS-BMK, 2013 WL 4679130, at *3 (D. Haw. Aug. 30, 2013); *Snowden v. Connaught Laboratories, Inc.*, 137 F.R.D. 325, 332-33 (D.Kan. 1991).  Similarly, a party may not evade compliance with Rule 34 by utilizing a system of record-keeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them, and thus renders the production of documents excessively burdensome and/or costly. *Dunn v. Midwestern Indem.*, 88 F.R.D. 191, 198 (D. Ohio, 1980).

In the context of discovery of ESI, "whether production of [such] documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)." *Zubulake v. UBS Warburg LLC*, et al., 217 F.R.D. 309, 318 (S.D.N.Y. 2003).  When considering a motion to compel production of ESI, the court conducts a three-part inquiry. 1) Whether the party opposing production has demonstrated that the ESI is not reasonably accessible due to undue burden or undue cost.  2) Whether the party seeking production has demonstrated, notwithstanding the inaccessibility, good cause for production. 3) Whether cost sharing is appropriate.  *See* Fed. R. Civ. P. 26(b). When considering cost shifting, courts look to the *Zubulake* factors. *See Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 324 (S.D.N.Y. 2003);  *Tierno v. Rite Aid Corp.,* No. C–05–02520–TEH, 2008 WL 3287035, at *4 (N.D. Cal. July 31, 2008) (characterizing the *Zubulake* factors as a "gold standard" in ESI discovery disputes).

(a)   **Request 49 – Class list and damages.**

The parties agree that virtually all of NMAC's records that are responsive to Plaintiffs' requests (49 (a) – (q)) is available in standardized electronic formats – SQL and Excel.  NMAC downloads most of this responsive information between its

own systems on a daily basis.[4]  Thus, any information which could be responsive is available within active NMAC systems which are regularly used and consulted by NMAC in the ordinary course of its business.  There is no indication that any of the information sought has been archived or resides off-site for NMAC.  As such, the information can be compiled into a single response satisfying the request.

In spite of the availability of this data, NMACs claims that it cannot identify the numbers which belong to non-customers of NMAC.  This objection rests upon NMAC's practice of adding non-customer phone numbers into data fields which NMAC attributes to its actual customers in the Siebel Contacts table.  (*See*, *e.g.*, NMAC 000874 (adding "mom's cell" to account to be auto-dialed).  NMAC claims that it has no ability to distinguish between the phone numbers of customers and non-customers once the non-customer number has been added to the customer's contact information.  This objection fails on factual grounds.  NMAC's representatives have testified that NMAC adds new numbers to its customer contacts using a "Service Request" process. (*See* Ramsey at 93:13 – 94:25, Newman at 24:19 – 26:6, *e.g.* NMAC 000828 (Service Request adding Tatyana Davtyan's cell phone number to customer account).  NMAC maintains a searchable table of these service requests and codes them to reflect changes to phone numbers and do not call flags.  (*See* Ramsey at 96:3 – 98:13).  NMAC notates the customer's account notes to reflect these changes (*Id.*).  Thus, NMAC need not manually search through all its notes, but rather, only those associated with a change of address.  As stated by Plaintiffs' consulting expert Mark St. Peter, these functions can ordinarily be performed using search algorithms once data has been sampled and keywords are identified. (Declaration of Mark St. Peter.) As such, the information is available and NMAC need only assemble it from the various sources of data in its care, custody

---

[4] Nearly all of the information sought can be compiled from the SEIBEL database, the Noble DAT logs, and the PBX logs, all of which are downloaded each day.

and control. The precertification discovery of class members, common claims and common defenses is an appropriate subject of discovery and appropriate to the needs of a class case. *Reed v. 1-800 Contacts, Inc*, 2013 WL 12092055, at *4 (S.D. Cal. 2013).

### (b)   Request 51 -- TCPA Registrations

This request seeks NMAC's registration for its autodialer system with the State of Texas.  While NMAC claims that it would be unduly burdensome to find this state-mandated registration, it has provided no factual basis to support its claim of "undue burden."  In the absence of a factual basis, the Court should overrule the objection for undue burden.  *See*, *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991).

### (c)   Request 52 -- Proof of consent.

Request 52 seeks NMAC's evidence of consent by the proposed class members.  As it relates to this action, this request seeks information concerning NMAC's Third Affirmative Defense, "consent."  (See R.43 at PgID 225.)

FCC guidance established that in claims involving alleged TCPA violations, the defendant bears the burden of establishing consent.  "Moreover, we emphasize that regardless of the means by which a caller obtains consent, under longstanding Commission precedent, if any question arises as to whether prior express consent was provided by a call recipient, the burden is on the caller to prove that it obtained the necessary prior express consent."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,  30 F.C.C. Rcd. 7961 (2015). Thus, prior express consent is an affirmative defense, and a defendant bears the burden of proving it. *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n. 1 (9th Cir. 2011) ("[E]xpress consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof[.]"); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV146256JGBJPRX, 2016 WL 3456939, at *8 (C.D. Cal. Apr. 14, 2016) (Bernal,

1  J.);*see also Van Patten v. Vertical Fitness Group, LLC*, 22 F.Supp. 3d 1069, 1073
2  (S.D. Cal. 2014); *Connelly v. Hilton Grant Vacations Co., LLC*, 2012 WL 2129364,
3  *3 (S.D. Cal. June 11, 2012)).

4      In this case, NMAC has placed this complete affirmative defense at issue.
5  Because NMAC bears the burden of proof on this defense, any burden associated
6  with production of documents or ESI concerning this burden is neither "undue" nor
7  "disproportionate" to the needs of the case.   The Court should overrule this
8  objection.

9               **(d)     Request 53 – Dialer Instructions.**

10      Request 53 seeks the business rules concerning the operation of NMAC's
11  autodialer and prerecorded messages.   NMAC's manager of Predictive Dialing
12  (Matt Ramsey) is familiar with these rules and used them to determine the number
13  of prerecorded messages to Marine and Tatyana Davtyan.  (Matt Ramsey, 139:15-
14  23).  This information is readily available and does not represent an undue burden.
15  The Court should require production of this information, which can be used to
16  calculate when and to whom prerecorded messages were directed and overrule this
17  objection.

18               **(e)     Request 54 – Source documentation of class**
                 **information.**
19

20      Request 54 seeks ESI comprising the source of the information used to
21  compile the class list in Request 49.   There are three known sources for this
22  information, each of which NMAC maintains and regularly uses.   The first is the
23  SIEBEL database, which NMAC downloads daily and loads into the Genesy-Noble
24  systems. (Ramsey at 54:8-11). The second are the DAT logs. These are maintained
25  in NMAC's BTTC directory on the Q: drive.  The third are the PBX logs, which
26  record call actively.  Each of these files is regularly used and maintained, and can be
27  produced in their native formats with no more effort than is ordinarily taken when
28  NMAC copies and uses these files.  Plaintiffs have already provided NMAC with a

1  2TB drive for transfer of this information, and any burden is minimal in light of the

2  need for this information.  The Court should overrule this objection.

              **(f)**        **Request 56 and 57 – TCPA compliance audits for NAMC and its Vendors.**

5        These requests seek information concerning reviews and audits conducted to

6  determine whether NMAC is in compliance with the TCPA.  NMAC has provided

7  no factual support for its claim of undue burden.  The Court should overrule this

8  objection.

              **(a)**        **Request 60 – Organizational chart.**

10        This request seeks an organizational chart for NMAC.  Both Mr. Ramsey and

11  Ms. Fukuyama have indicated that they have seen this chart and it is stored on the

12  Q: drive.  NMAC has offered no explanation for the burden required in producing

13  this document.  The Court should overrule this objection.

              **2.**        **Overbreadth – Requests 49, 52, 53, 54, 56, 57, and 60 are reasonably tailored to assemble a class list, measure class damages, identify common issues, and identify individual class members.**

17        NMAC objects that the discovery requests are overbroad.  A discovery

18  request is overbroad where it is not reasonably tailored to the discovery of relevant

19  information. *See*, *e.g.*,  *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528

20  (D. Nev. 1997) *Braun v. Medtronic Sofamor Danek, Inc.*, 2013 WL 30155, at *2 (D.

21  Utah Jan. 2, 2013).  A propounding party has no duty to craft their request more

22  concisely without complete knowledge within the exclusive control of the

23  responding party.  See *Bayer AG v. Sony Elecs., Inc.*, 202 F.R.D. 404, 407 (D. Del.

24  2001).  As set forth below, the discovery requests at issue are reasonably tailored to

25  produce admissible evidence, and are therefore not overly broad for purposes of the

26  disputes at issue in this case.

21

### (a)   Request 49 – Class list and damages.

Request 49 seeks information concerning individuals who have received calls from NMAC.   Plaintiffs seek this information in order to compile a class list, measure class damages, and identify likely witnesses. *See*, *e.g.*, *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, 2014 WL 5421247, at *2 (W.D. Wash. Oct. 23, 2014). NMAC objects to the breadth of the request, claiming that the requests seeks information concerning calls placed to recipients over services not at issue in this case such as land lines and VOIP.

While NMAC claims that this failing renders the request fatally flawed, NMAC continues to maintain that it cannot itself distinguish between the nature of the recipient's service based on its own internal records.   (*See*, *e.g.*, NMAC Response 49 ("[c]alls placed through Genesys do not distinguish calls placed to cellular telephones versus landlines.")  Because NMAC has failed to provide access to its systems or persons knowledgeable about them,[5] Plaintiffs cannot conceivably further tailor their request.  Indeed, NMAC has yet to offer any other suggestions or methods for obtaining the data necessary to assemble a class list or access individual class members who might serve as fact witnesses.[6]   Additionally, Plaintiffs have maintained throughout this litigation that any call list would need to be scrubbed for cell phone numbers as had been done in any number of other TCPA cases using subpoenas to cellular carriers or through commercially available services.  Given the

---

[5] NMAC's 30(b)(6) witnesses repeatedly claimed a lack of knowledge concerning the underlying data structures available to NMAC, and instead deferred questions to NMAC's head of Information Services, Eileen Fukuyama.  (Ramsey at 119: 3-20, 121: 7-12, 131: 2-8, 152: 3-11, 162: 18-24, 171: 4-15, 178: 14-25) and Sterling at 33: 7-15, 38: 1-15, 39: 1-3, 84: 5-7, 86: 5-15, 89: 21-23, 91: 19-24, 109: 6-9, 119: 24-25, 120: 1-2).  Ultimately, when Plaintiff questioned Ms. Fukuyama, she claimed a complete lack of knowledge concerning the workings of NMAC's systems as NMAC has outsourced all data services.  (Fukuyama at 22: 8-21, 25: 5-10, 28: 1-11, 31: 1-13, 32: 6-18, 33: 1-13, 42: 12-17).

[6] See Declaration of Ian Lyngklip, Exhibit 5.

1  fact that NMAC has provided no alternatives, this request is reasonably tailored to
2  compile a class list and evidence of the class damages.

### (b)     Request 51 -- TCPA Registrations.

4       Request 51 requests registration information for NMAC's ATDS systems and
5  specifically identifies registrations with the state of Texas under its scheme for
6  registering systems which leave prerecorded messages.  This request is reasonably
7  tailored to obtain evidence that NMAC operates a system which leaves prerecorded
8  messages.  NMAC has failed to provide any explanation as to how this request asks
9  for any information beyond the scope of this case.  As such, the Court should reject
10 this objection.

### (c)     Request 52 -- Proof of consent

12      This request seeks information concerning the identity of class members who
13 NMAC claims have consented to calls.  This information relates exclusively to
14 NMAC's affirmative defense in this case, and NMAC has provided no information
15 how this information has been organized or stored such that Plaintiffs could more
16 narrowly tailor the request.  In the absence of any information allowing a more
17 narrow crafting, the Court should require NMAC to produce the information in its
18 possession or forfeit the defense.

### (d)     Request 53 – Dialer Instructions

20      This request seeks information concerning the operation of NMAC's dialer
21 and delivery of prerecorded messages.  This request is facially tailored to obtain
22 information which would support Plaintiffs claims that NMAC used an autodialer
23 and prerecorded voice to call putative class members.  NMAC has failed to provide
24 any information to suggest that the request seeks information beyond the scope of
25 discovery.  The Court should reject this objection and require NMAC to provide the
26 requested information.

27
28

**(e)     Request 54 – Source documentation of class information.**

This requests seeks the NMAC data that would be used to assemble the data compilation in request 49.  Given the 30(b)(6) testimony of NMAC, three data sources are at issue, 1) Noble DAT Logs, 2) Genesys PBX Logs, and 3) SIEBEL data.[7]  NMAC has refused to produce this source data, claiming that the request is overly broad.  While answers to Plaintiffs' requests would no doubt contain information concerning calls to non-class members, the requests at issue call for production of original data, and NMAC has provided no information or technical assistance to identify original data files which would contain a narrower data set.  To the contrary, NMAC maintains throughout its objections – and relies on the fact – that it does not segregate its data in a fashion that would allow it to discriminate between calls to customers and non-customers, nor can it distinguish between calls to cell phones, land lines or VOIP lines.

Thus, NMAC simultaneously refuses to provide compilations because it cannot segregate its records and will not produce its original data files because they are unsegregated.  If NMAC cannot segregate its records to obtain a list of non-customers and corresponding call data, Plaintiffs will be able to do that for them.

Case law only requires that *the request* at issue be reasonably tailored to obtain relevant information.  In light of NMAC's insistence that it cannot identify any unsegregated sources of the requested data, the most narrowly tailored request is one which provides the source data.  NMAC has provided no alternatives as to how Plaintiffs might more narrowly draw their request.  Taking NMAC objections as true, NMAC cannot produce any evidence that it segregates customer calls from non-customer calls.  As such, Plaintiffs cannot tailor their request any more

---

[7] As stated by Matt Ramsey, this data is available and is created or downloaded on a daily basis (Ramsey, 54:8-11, 134:8-18, 138:7-16).

narrowly and Plaintiffs must have the original data files in order to themselves identify non-customers and cellular phone holders identified in NMAC's call logs. Because the request is as narrowly tailored as Plaintiffs reasonably can make it, the Court should overrule this objection and require NMAC to produce its source data. *Bayer AG, supra.*

> **(f)     Request 56 and 57 -- TCPA audit information for NMAC and its vendors.**

While NMAC claims that Plaintiffs' request for TCPA audit information is overbroad, NMAC has provided no information to suggest that the Plaintiff is requesting any information beyond the scope of the case.   Rather, audits of compliance with the TCPA may provide substantial evidence of a knowing violation of the TCPA, and the Court should require NMAC to produce any responsive information.

> **(g)     Request 60 – Organizational Chart.**

Plaintiffs are seeking a copy of NMAC's organizational chart to identify individuals with information concerning NMAC's practices and compliance with the TCPA.   In light of NMAC's unwillingness to self-identify individuals with knowledge of its available data,[8] this information is necessary to identify responsible individuals. At the same time, NMAC has failed to provide any information to suggest that this request is facially overbroad.   On the contrary, NMAC's own witnesses have stated that its organizational chart is easily accessible and resides on the Q: drive. As such, the Court should overrule NMAC's objection and require production of NMAC's organizational chart.

---

[8] See n.5, *supra*.

### 3. GLBA and Privacy -- Requests 49, 51, and 54 do not require NMAC to violate the Gramm-Leach Bliley Act, and any minimal invasion of privacy can be ameliorated through a protective order.

NMAC claims that the information sought by RTP 49, 51, and 54 would require it to violate the Gramm-Leach Bliley Act ("GLBA"), 15 U.S.C. §§ 6801-6809.

This argument fails for the same reasons as NMAC's earlier objections to the Verizon Subpoena, which this Court previously ruled on [Dkt. 62]. The GLBA permits disclosures of covered information in response to judicial process. As with subpoenas, requests for production do not fall within the GLBA's prohibitions on disclosure. 15 U.S.C. § 6802(e)(8). Accordingly, "15 U.S.C. § 6802(e)(8) permits a financial institution to disclose the non-public personal financial information of its customers to comply with a discovery request". *Marks v. Global Mortgage Group*, 218 F.R.D. 492, 495-497 (S.D.W.Va. 2003) (civil action alleging predatory lending practices); *see also*, *Sohal v. Fed. Home Loan Mortg. Corp.*, 2012 WL 4113721, at *3 (N.D. Cal. Sept. 18, 2012); *In re Suzuki*, 2014 WL 6908384, at *4 (D. Haw. Dec. 5, 2014); *RQ Constr., Inc. v. Ecolite Concrete U.S.A., Inc.*, 2010 WL 3069198, at *2 (S.D.Cal. Aug. 4, 2010).

Additionally, privacy does not operate as an absolute bar to discovery. Rather, "[r]esolution of a privacy objection ... requires a balancing of the need for the information sought against the privacy right asserted." *Keith H. v. Long Beach Unified School Dist.*, 228 F.R.D. 652, 657 (C.D.Cal.2005). *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006); *Johnson by Johnson,* 971 F.2d at 1497; *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 191 (C.D. Cal. 2006).

#### (a) Request 49 – Class list and damage.

On its face, Request 49 does not seek any information governed or protected by the GLBA. Rather, this request seeks only information about individuals who

are not NMAC customers and received autodialed calls or prerecorded messages. The request does not seek any personally identifiable information governed by the GLBA and NMAC has failed to identify any responsive information which would be governed by that statute. The only conceivably sensitive material at issue for this request is the contact information for class members. Case law holds that this information is not confidential and is routinely exchanged in class actions. *Khalilpour v. CELLCO P'ship*, 2010 WL 1267749, at *3 (N.D. Cal. Apr.1, 2010) ("the disclosure of names, addresses, and telephone numbers is common practice in the class action context because it does not involve revelation of personal secrets, intimate activities, or similar private information, which have been found to be serious invasions of privacy"); *Coleman v. Jenny Craig, Inc.,* 2013 WL 2896884, at *7 (S.D. Cal. 2013) (collecting cases); *Willner v. Manpower, Inc.*, 2012 WL 4902994, at *6 (N.D. Cal. Oct. 16, 2012). Similarly, "before class certification has taken place, all parties are entitled to equal access to persons who potentially have an interest in or relevant knowledge of the subject of the action, but who are not yet parties." *Wiegele v. FedEx Ground Package Sys.*, 2007 WL 628041 (S.D.Cal. Feb.8, 2007); *Salgado v. O'Lakes*, 2014 WL 7272784, at *10 (E.D. Cal. Dec. 18, 2014); *Artis v. Deere & Co.*, 276 F.R.D. 348, 353 (N.D. Cal. 2011); *Davis v. Chase Bank U.S.A., N.A.,* 2010 WL 11479333, at *2 (C.D. Cal. Feb. 25, 2010) (Walsh).

The information sought is not protected by either GLBA or common law privacy interests. Case law provides that this information should be equally available to Plaintiffs, and NMAC has failed to identify any information sought which requires additional protection. To the extent that the Court finds protection of this information is needed, the parties have entered a protective order, and the Court may freely provide any additional protections necessary when ordering disclosure of this information by NMAC to Plaintiffs' counsel. See *Cabessa v. Burbank Blvd Apartments Owner, LLC,* 2015 WL 9692804, at *3 (C.D. Cal. Dec. 9, 2015) (Segal); *Columbia Pictures Indus., Inc. v. Fung*, 2007 WL 9627899, at *2 (C.D. Cal. May

31, 2007).   An appropriate protective order could minimize the impact of this disclosure. See *Kelly v. City of San Jose, 114 F.R.D. 653*, 666 (N.D. Cal. 1987); *Soto v. City of Concord*, 162 F.R.D. 603, 616 (N.D. Cal. 1995).   Accordingly, the Court should overrule these objections and require disclosure by NMAC or require disclosure under an appropriate protective order limiting use of the information.

### (b)   Request 52 – Proof of consent.

Request 52 only seeks information concerning consent given by class members for the autodialed calls and prerecorded messages delivered by NMAC. Each of these individuals is a non-customer of NMAC, and as such the request does not seek any private financial information or personal identifiers which would be governed by the GLBA.   NMAC has failed to identify any responsive information which would be governed by that statute.   As such, the Court should overrule this objection.

### (a)   Request 54 – Source documentation of class information

Request 54 seeks source documentation for the compilation of NMAC's call list in Request 49.   At present, Plaintiff is aware of three sources for this data:  1) the DAT Logs of autodialer activity, 2) the PBX Logs of call activity, and 3) SIEBEL data.   As to the first two categories, no private information has been sought, and NMAC has provided no explanation of how production of this information would violate either GLBA or any common law privacy protections.

As to the SIEBEL data, the information requested would necessarily include data concerning NMAC's clients.  As set forth above, production of this infomraiton within the context of active litigation does not present a violation of the GLBA. Plaintiffs agree that in relation to NMAC's customers, this information is private and should be maintained as such.   Consequently, Plaintiffs believe that the Court should limit access to this information to Counsel and the experts in this case, and limit use to the assembly of the class list, determination of damages, and extraction

of information concerning facts and circumstances surrounding the addition of the class members to NMAC's database. Plaintiffs would stipulate to destruction of this material upon completion of this review.

Under the well-established construction of the GLBA, NMAC may not use the GLBA as a shield to avoid production of information that would permit Plaintiffs to assemble a class list. Rather, the discovery request falls within an established exemption to the GLBA, and the Court may enter an appropriate order permitting use of the information within NMAC's care, custody and control.

### 4. Privilege -- NMAC has not properly asserted its claims of privilege concerning its TCPA compliance audits

In response to the request for compliance audits, NMAC has claimed both attorney-client and work product privilege. An entity that withholds discovery materials based on a privilege must provide sufficient information (i.e., a privilege log) to enable the requesting party to evaluate the applicability of the privilege or other protection. Fed. R. Civ. P. 26(b); *see* C*larke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Failure to provide sufficient information may constitute a waiver of the privilege; *see Eureka Fin. Corp. v. Hartford Acc. & Indem. Co.*, 136 F.R.D. 179, 182-83 (E.D. Cal. 1991). Blanket objections are insufficient and improper. *Davis v. Fendler*, 650 F.2d 1154, 1160 (9th Cir. 1981). In this case, NMAC has provided no privilege log or any information to allow either the Plaintiffs or the Court to evaluate the privilege. In the absence of this required information, the Court should reject any claim of privilege and require NMAC to produce any responsive documents.

### 5. Confidentiality – NMAC has failed to identify any information requiring protection beyond the protective order issued in this case.

NMAC has objected to requests 49, 52, and 54 on grounds that the information sought is "confidential, and/proprietary in nature" to NMAC. The Federal Rules provide for the protection of "confidential" materials under Rule 26.

1   Confidentiality, however, is generally not grounds to withhold information from

2   discovery. Confidentiality does not equate to privilege. *Federal Open Mkt. Comm. v.*

3   *Merrill*, 443 U.S. 340, 362  (1979). "Confidentiality alone is not an objection which

4   precludes discovery." *Aramburu v. Boeing Co.*, 1994 U.S. Dist. LEXIS 20675, No.

5   93-4064- SAC, 1994 WL 810248, at *1 (D. Kan. Sept. 22, 1994).   Further, the

6   protections afforded are provided only after a party moves for a protective order

7   with adequate proof of the nature of the confidentiality.  The moving party must also

8   make "a particular and specific demonstration of fact, as distinguished from

9   stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102

10   n.16 (1981).

11          In this case, the parties have already stipulated to entry of a protective order

12   covering information of this nature.  (R.47 at ¶2.)  Under this order, NMAC may

13   freely designate this material as confidential under the protective over.  NMAC has

14   failed to identify any information which requires any additional protection or any

15   reason why the protections afforded would be insufficient.  For this reason the Court

16   should overrule this objection, require production, and permit NMAC to designate

17   any responsive materials produced as "CONFIDENTIAL" under the existing

18   protective order.

19          **B.      NMAC's Position**

20                  **1.      Request 49**

21          Although Plaintiffs describe Request No. 49 as requesting a "class list," it

22   seeks far more than that.  Plaintiffs are asking for 17 different categories of

23   information pertaining to each and every call that NMAC placed to non-customers

24   over the course of the the past 5 and ½ years.

25          NMAC is unable to provide this information, first and most simply, because it

26   is unable to identify calls that were made to non-customers, i.e., class members, and

27   it said so in its response.  NMAC could have stopped there.  But, in an effort to

28   provide as complete and thorough a response as possible, NMAC went on to provide

1    a lengthy and detailed response to this request in which it explained the many

2    reasons why it is unable to provide the information requested.

3         In their motion, Plaintiffs challenge essentially every explanation NMAC has

4    given as to why compliance with this request is impossible.  So NMAC responds to

5    each of Plaintiffs' arguments below.

6                    **(a)    NMAC's Systems Cannot Be Searched in An
                              Automated Fashion to Identify Non-Customer Calls.**

7

8         To begin, it is helpful to understand how NMAC's systems are set up.

9    NMAC's database does not store outgoing calls of persons "who are not YOUR

10   customers," i.e., non-customers.  NMAC's Genesys and Cisco dialer systems can

11   only dial numbers that are stored in its Siebel database.[9]  Telephone numbers are

12   entered into Siebel when provided by NMAC's customers, and stored in six Siebel

13   fields.[10]  Accordingly, NMAC's Genesys and Cisco dialer systems can only dial

14   numbers that are added to fields designated as containing customer numbers.

15        To the extent a non-customer's telephone number was entered into one of the

16   six Siebel fields to which the Genesys and/or Cisco dialing systems have access,

17   neither Siebel, Genesys or Cisco can identify those persons or segregate them from

18   those called parties who are NMAC's customers.[11]  Accordingly, there is no data

19   pertaining to calls placed to non-customers that is "reasonably accessible" under

20   F.R.C.P. 26(b)(2)(D).

21

22

23

24

---

25   [9] Sterling Depo. 25:02-25:08, 28:01-21, 51:24-52:20, 69:01-70:09, 72:21-73:11,
26   91:25-92:4; Newman Depo. 40:01-05, 67:14-68:12, 81:19-83:03.

27   [10] Newman Depo. 11:17-21, 13:24-14:08, 26:16-28:04, 29:10-30:07, 40:01-05.

28   [11] NMAC Dec. ¶¶34, 36, 37.

**(b)      Nor Is A File By File Review A Practical Method For Identifying Any Non-Customers Who Might Have Been Called by NMAC**

Since NMAC's systems do not identify or segregate non-customer from customer numbers, to the extent a non-customer's telephone number may have been entered into one of the six Siebel fields (e.g., because it was provided by an NMAC customer as the number where the customer could be reached), then a review of each individual account would be required to determine whether such a factual situation exists.

Not only would a file by file review be required, but the content of the notes logs for the account would need to be interpreted.[12]  One would need to first read the content of the notes.  Then one would need to make a judgment call about the content of that call.  For example, does the note suggest that the customer was providing her new phone number, or that she was providing a third party number at which she could be contacted?  There would be no definitive way to identify which phone numbers belong to the third parties (non-customers) whom plaintiffs wish to include in their class, and to which this request for production is limited.

Further, class members may not be "identified" in such a subjective manner. It is well-settled that, in order to obtain class certification, a plaintiff must show that class members are ascertainable using objective criteria.  "If class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate."  *Martino v. Ecolab, Inc.*, No. 14-CV-04358-PSG, 2016 WL 614477, at *10 (N.D. Cal. Feb. 16, 2016).

Nor would it be practical to identify non-customers in the manner Plaintiffs propose.

---

[12] *Id.*; Newman Depo. 63:13-18, 81:19-82:19, 123:12-20, Ex. 22 hereto.

NMAC currently has 2.9 million active accounts.[13]  Since January 1, 2012, NMAC has had approximately 5.1 million accounts.[14]  Responding to this request would require a file by file review of the Siebel notes for each one of these 5.1 million accounts.  Each account contains, on average, approximately 57 activity notes entries.  It would take at least 30 minutes to read and interpret the content of the notes logs for each account.[15]  The cost per hour for NMAC to conduct this search would be $74 per hour.[16]  Consequently, the cost to conduct the review just to attempt to identify any non-customers whose data is to be produced would be approximately $188,700,000.[17]  This estimate does not include the additional time and expense of gathering the complete 17 categories of ESI for these persons if those persons could actually be identified.[18]  The request is burdensome.

---

[13] NMAC Dec. ¶25.

[14] *Id.*

[15] NMAC Dec. ¶35.

[16] *Id.*

[17] *Id.*

[18] A party has the right to avoid the discovery of ESI "from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Fed. R. Civ. P. 26(b)(2)(B).  "As employed in this jurisprudence, the term 'inaccessible' does not necessarily indicate the relevant ESI is physically damaged or written in an obscure format; rather, 'inaccessible' simply means that expenditure of resources required to access the contents is itself unreasonable."  *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 239 (S.D. Cal. 2015).

When considering a motion to compel production of ESI, courts generally conduct a three-party inquiry: (1) whether the ESI is not reasonably accessible due to undue burden or undue cost, (2) whether the party seeking production has demonstrated, notwithstanding the inaccessibility of the ESI, good cause for production in light of the factors listed in Rule 26(b)(2)(C) and the Advisory Committee notes, and (3) upon a requisite showing of the first two steps, whether cost-sharing is appropriate.  See, e.g., *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH, 2015 WL 5056726, at *2 (D. Nev. Aug. 25, 2015), citing

Additionally, calls placed through the Genesys and Cisco dialing components do not distinguish calls placed to cellular telephones from those placed to landlines.[19] So, even if non-customer telephone numbers could be identified (they cannot), the result would still not be a class list, so the request is defective for this reason as well.  See *Doherty v. Comenity Capital Bank & Comenity Bank*, Case No.: 16cv1321-H-BGS, 2017 WL 1885677 (S.D. Cal. 2017) (denying discovery of skip-traced and trapped numbers where a file-by-file review would be required); *Gossett v. CMRE Financial Services*, 2015 WL 6736883, at *1 (S.D.Cal. 2015) (denying "skip tracing" discovery in TCPA case on the basis that third party numbers were never downloaded from the account notes into the dialer). In order to tailor this search to the class alleged by Plaintiffs, NMAC would thus have to incur additional time and expense trying to determine which telephone numbers are landlines versus cellular telephones.  To make such a determination, NMAC would need to retain the services of a third party vendor who specializes in scrubbing lists of telephone numbers to identify those that are cellular.  The cost of such an exercise is unknown at this time.

---

Fed. R. Civ. P. 26(b)(2)(B)-(C) and 2006 Advisory Committee notes to Fed. R. Civ. P. 26(b).

The responding party has the burden of establishing that the ESI is not reasonably accessible "in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found."  2006 Advisory Committee notes to Fed. R. Civ. P. 26(b).  Whereas the requesting party has the burden of "showing that its need for the discovery outweighs the burdens and costs of locating, retrieving, and producing the information."  See *ibid*.

[19] NMAC Dec. ¶9.

1    **(c)    Plaintiffs' Proposed "Service Request" Search Does**
2    **Not Cure These Problems.**

3        Plaintiffs argue that non-customers called by NMAC can be identified in an

4    automated fashion by searching Service Requests for telephone number changes.

5    Here, too, they are wrong.

6        Service Requests fall into categories.  For example, telephone number

7    changes fall into the "Address Change" category.[20]  Also included in the Address

8    Change category are changes to the customer's mailing address, and other account

9    changes.   Thus, simply exporting a list of Address Changes Requests will not get

10   Plaintiffs to their goal of a list of non-customers.

11       Instead, each account that had an Address Change Request would have to be

12   individually and manually downloaded.[21]  Each Service Request is approximately a

13   page and a half in length.[22]  Each Address Change Request would have to be

14   reviewed in conjunction with the Siebel notes logs to determine why the number

15   was changed, to whom it belonged, and whether it appears that the new or prior

16   phone number belonged to a non-customers.  Again, this would be a judgment call,

17   and the law clearly precludes the use of subjective judgment calls to identify class

18   members.  Just because a phone number associated with an account is changed

19   during the servicing of an account does not mean that the number belonged to a non-

20   customer who is included in Plaintiffs' putative class.[23]

21       To further complicate matters, wrong number changes are also included in the

22   Address Change category.  This designation on a Service Request is not dispositive

23

24   _____

25   [20] Ramsey Depo 99:11-19.

26   [21] NMAC Dec. ¶38.

27   [22] *Id.*

28   [23] Ramsey Depo 97:8-98:13; 99:11-25.

that the number belonged to a non-customer.[24]  Instead, a file by file review would need to be completed to determine if the number was coded as "wrong" because a number was entered incorrectly because of a clerical error, or the customer had recently changed jobs or moved, or that the number was no longer considered "good" for some other reason.  Even if the number on the account was changed because the person answering the call claimed the wrong number had been dialed (impossible to tell from the Service Request itself), there would be no way to verify whether the person who answered the phone was or was not a customer.  The list of explanations is lengthy and certainly not capable of a blanket determination that all such Service Requests related to non-customers.  After pulling each Service Request, someone would then need to review the corresponding Siebel notes log to attempt to determine the reason for the number change—and at the end, this would again be a judgment call, which cannot be the basis for a determination of class membership.

Plaintiffs also point to the Do Not Call category of Service Requests.  Again, that category in and of itself does not designate non-customers.[25]  Do Not Call Service Requests encompass a wide variety of circumstances, including customers exercising their rights under federal and state debt collection statutes to stop calls, and customers who no longer wish to receive calls at a particular phone number they previously provided to NMAC.  Again, a file by file review of the Siebel notes logs and application of judgment would be needed, and it would be impossible to compile the class list in the manner proposed by Plaintiffs.[26]

---

[24] Ramsey Depo 99:20-25, 100:14-19.

[25] Ramsey Depo 100:1-13.

[26] Ramsey Depo. 101:12-102:8; NMAC Dec. ¶38.

**(d)     Request No. 49 Seeks Data On Calls That Plainly Do Not Fall With the Class Definition or The Scope of The TCPA**

This case *only* involves calls made in violation of the TPCA, i.e. using an ATDS or prerecorded message.[27]   Despite the class definition found in their First Amended Complaint which so limits this case, Plaintiffs seek all calls made by NMAC, including *manually* dialed calls.[28]   This issue is highlighted by the information requested in Subsections (K), (N), and (O).  Such a request is not only overbroad, but constitutes a disallowed fishing expedition.  *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004).

**(e)     Subsection (E) Requires A File by File Review**

For each call placed to a non-customer, Request No. 49 (E) asks for the identity of the person reached "[i]f different that the intended party called…."  This request necessarily requires the manual review and interpretation of the Siebel notes logs in order to determine the intended recipient of the call and compare that person with the person who answered the phone.[29] NMAC's systems do not automatically notate the name of the person who answered a call.

**(f)     Subsection (G) Seeks Information Outside NMAC's Possession**

Subsection (G) seeks the carriers of each outbound call.  This request is disproportionate for several reasons.  There is no evidence in the record to suggest that NMAC has any information regarding the cell phone carrier for the number dialed by NMAC, assuming that the numbers are even cell phones.  To the contrary,

---

[27] FAC, ¶¶ 26, 34, 41, 50, 51, 58.

[28] "TCPA claims are conditioned on upon the use of an ATDS." *Doherty v. Comenity Capital Bank & Comenity Bank*, No. 16CV1321-H-BGS, 2017 WL 1885677, at *8 (S.D. Cal. May 9, 2017); *see* 47 U.S.C. § 227(b)(1)(A)-(B).

[29] Newman Depo. 63:13-18, 81:19-82:19, 123:12-20, Ex. 22 hereto; NMAC Dec. ¶¶34, 37.

1  NMAC witnesses have testified that the six Siebel fields are unverified, meaning

2  that the designation of "home," "work" and "cell" are based on the representation of

3  the customer as opposed to an independent investigation by NMAC.[30]

4          **(g)    Subsection (H) Requires A Manual Review Of Siebel
            Notes**

5

6          Subsection (H) seeks the "identity of the collector—including any computing

7  system or array of systems—initiating the call."  Plaintiffs are correct that Matt

8  Ramsey testified that, for calls made the dialer, the DAT files designate the specific

9  dialer campaign and the NMAC agent (if the call was connected to an agent).[31]

10 However, this Request does not seek only calls made by a dialer.  Instead, as

11 discussed above, this Request seeks all calls, including *manually* dialed calls.  The

12 DAT file has nothing to do with manually placed calls,[32] which are manually dialed

13 and notated in Siebel.[33]  The agent determines the disposition of the call and enters

14 the text in the activity / note.    As such, to identify manually placed calls and the

15 NMAC agent that initiated those calls, a file by file review of the Siebel notes would

16 be required.

17         **(h)    Subsections (P) And (Q) Also Require A File By File
            Review**

18

19         Subsections (P) and (Q) specifically seek a determination of consent provided

20 to NMAC.  The only way to try to determine this information would be to conduct a

21 file by file review of all Siebel notes logs and attempt to determine what was said

22

23

24 _____

25 [30] NMAC Dec. ¶9.

26 [31] Ramsey Depo 129:23-130:11.

27 [32] Ramsey Depo 127:17-128:7.

28 [33] Newman Depo 87:8-90:8.

during documented conversations, or whether consent was provided through another means (e.g., in the account application).[34]

### (i)   NMAC Cannot Be Required to Provide Overbroad Responses That Include Information About Customers/Non-Class Members

Given the impossibility of identifying non-customers and providing the information sought by Plaintiffs, Plaintiffs may contend that NMAC should be required to provide the requested information for both customers and non-customers alike.  That is not a viable solution to the problems posed by Plaintiffs' requests, however.

In determining whether a discovery request is overbroad, courts must weigh the value of the requesting party's asserted interest in the information sought against the burden and cost of providing it.  *See Meeks v. Parsons*, No. 1:03-CV-6700-LJO-GSA, 2009 WL 3003718, at *8 (E.D. Cal. Sept. 18, 2009), *citing Richards of Rockford, Inc. v. Pac. Gas & Elec. Co.*, 71 F.R.D. 388, 390 (N.D. Cal. 1976); *see also Rowlin v. Alabama Dept. of Public Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) ("The court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it….").

Notably, courts are not obligated to "fashion new discovery requests" where the subject requests are overbroad.  *Myles v. Cty. of San Diego*, No. 15CV1985-BEN (BLM), 2016 WL 4366543, at *8 (S.D. Cal. Aug. 15, 2016), *citing Bartolome v. City & Cty. of Honolulu*, 2008 WL 2736016, at *1, 14 (D. Haw. July 14, 2008) (declining to "invent a duty for a judge to fashion new discovery requests when the ones presented are overbroad").

Rather, the overbreadth of Plaintiffs' requests is itself a valid reason for denying their motion in its entirety. "Broad [discovery] requests are disfavored and may be disallowed." *MGA Entm't, Inc. v. Nat'l Prod. Ltd.*, No.

---

[34] NMAC Dec. ¶¶9-10.

CV1007083JAKSSX, 2012 WL 12886482, at *1 (C.D. Cal. Apr. 12, 2012), *citing Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly...."), *and Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (noting that the Manual for Complex Litigation § 11.443, at 75, encourages courts to "forbid sweeping requests" and to "direct counsel to frame requests for production of the fewest documents possible").

Further, production of information pertaining to NMAC customers who are not parties or even alleged class members would violate their privacy rights, which NMAC is obligated to safeguard under the Gramm-Leach-Bliley Act. NMAC's position regarding the GLBA and its customers' privacy rights is set forth in Section VII.B. below, in connection with Plaintiffs' fallback request to inspect NMAC's systems of records, its complete databases, and to extract data from those systems.

> **(j)** **Discovery Is Properly Limited in a Putative Class Action; A Plaintiff Is Not Permitted To Individually Litigate Every Putative Class Member's Claim.**

In their "Standard of Review" section, Plaintiffs make the unremarkable point that they are allowed to conduct precertification discovery in this putative class action. The statement is true, but the question on this motion is what is the scope of discovery that should reasonably be allowed?

While courts commonly acknowledge that "some class discovery is necessary prior to the determination of class certification," the "recognized need for pre-certification discovery, however, is subject to court-imposed limitations, and any such limitations are within the sound discretion of the court." *Wahl v. Am. Sec. Ins. Co.*, No. C 08-00555 RS, 2009 WL 3463211, at *1 (N.D. Cal. Oct. 23, 2009). District courts have broad discretion to permit, enjoin, or otherwise limit pre-certification discovery. See *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009); *Del Campo v. Kennedy*, 236 F.R.D. 454, 459 (N.D. Cal. 2006). In the exercise of this discretion, courts should not allow discovery that is so broad

1   as to present an undue burden on the defendant.  *Wahl*, supra, 2009 WL 3463211 at

2   *1, citing *Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 305 (D. Colo. 1998).

3       Here, Plaintiffs are essentially asking for every existing piece of data for

4   every call made to any class member.  The request is facially unreasonable, by any

5   standard.  Indeed, the request to review the circumstances of each call on every

6   individual account simply proves that Plaintiffs' putative class can never be

7   certified.  "The method of determining whether someone is in the class must be

8   'administratively feasible.'  A plaintiff does not satisfy the ascertainability

9   requirement if individualized fact-finding or mini-trials will be required to prove

10  class membership."  *Carrera v. Bayer Corp*., 727 F.3d 300, 307 (3d Cir. 2013)

11  (citations omitted).

12      For this reason, courts routinely deny such broad-brush discovery campaigns

13  by plaintiffs/would-be class representatives who have no feasible method for

14  identifying class members and proving their case based on class-wide evidence.

15  *See, e.g., Williams v. Veolia Transp. Servs., Inc*., CV08-2582-GW AGRX, 2008 WL

16  7389430, at *2-3 (C.D. Cal. Dec. 17, 2008); *Palmer v. Stassinos*, 5:04CV3026

17  RMW(RS), 2005 WL 3868003, at *4 (N.D. Cal. May 18, 2005) (denying motion to

18  compel several categories of documents relating to putative class members,

19  including identities of putative class members and details regarding putative class

20  members' accounts with defendant's collection agency, because requested

21  information is not "required to enable plaintiffs to file a motion for class

22  certification"); *Robbins v. NCO Fin. Sys., Inc.*, 2:06 CV 116, 2006 WL 3833352, at

23  *5 (N.D. Ind. Dec. 12, 2006) (denying plaintiff's motion to compel to the extent it

24  sought "names, addresses, and 'complete file, including computer information,' of

25  each putative class member"); *Walker v. Alta Colleges, Inc*., A-09-CV-894-LY,

26  2010 WL 2710769, at *8-9 (W.D. Tex. July 6, 2010) (denying discovery of financial

27  information of non-parties as premature pending class certification).

28

For each of these reasons, Request No. 49 is defective and a further response should not be compelled.

## 2. Request 51

In this request Plaintiffs seek production of "any registrations of systems" used by NMAC, its employees, agents or contractors to make the calls described in Request No. 49, that is, calls to non-customers.

This request is defective, first, for the same reason discussed above in connection with Request No. 49—because NMAC cannot identify non-customers it may have called. In addition, the request is vague as to what "registrations" are the subject of the inquiry, and burdensome because responding to this request would require NMAC to identify and obtain registrations obtained by third parties.

This request is also irrelevant, because the registration (or not) of automatic dialing systems is not relevant to any disputed issue in this case. Though Plaintiffs claim they need this information to verify whether NMAC "operates a system which leaves prerecorded messages," that can easily be verified by asking NMAC witnesses that question directly.

## 3. Request 52

Request No. 52 seeks two categories of information. First, as to consent for the calls NMAC placed by an ATDS to the cell phones of which Plaintiffs claim to be the regular users, those documents have been provided.[35]

Second, as to "CLASS MEMBERS"—that is, non-customers—NMAC is unable to comply with this request for all of the reasons discussed above with respect to Request No. 49. Non-customers cannot be identified in any automated or objective fashion. Nor is it possible to tell from NMAC's records whether a particular number dialed was even a cell phone.

---

[35] Newman Depo, Ex. 22 hereto.

For those reasons and others, no reasonable method exists for searching NMAC's databases and extracting information regarding the consent NMAC had to call any non-customer over the relevant period. The only way to determine this information would to individually research each account.

### 4.      Request 53

Plaintiffs' request for an order compelling a further response to Request No. 53 should be rejected for the same reasons. It, too, relates to the universe of calls placed to non-customers. As described above in connection with Request No. 49, this would first require the identification of calls placed to non-customers' cell phones over the past 5 and ½ years, which cannot be done in any rational, automated, objective fashion.

Further, Request No. 53 is nonsensical. It seeks "business rules and instructions" for dialer campaigns. Yet the category relates to all calls placed by NMAC, not just calls made using the dialer.

### 5.      Request 54

This request seeks the documents and ESI used by NMAC in compiling the list of telephone numbers provided in response to Request No. 49. But NMAC was unable to identify non-customers it has dialed, or provide the various categories of information described in Request No. 49. Therefore, compliance with this request is impossible and there are no documents to produce in response to Request No. 54.

### 6.      Request 56 and 57

It is unclear what Plaintiffs are seeking here, particularly given the broad definitions cross-referenced in these requests. To the extent Plaintiffs are seeking materials relating to any regulatory investigation, audit or legal review of NMAC's TCPA compliance, such materials are privileged and NMAC properly objected to them on that basis.

### 7.      Request 60

NMAC agrees to supplement its response to Request No. 60.

## VII.   PROPOSED RESOLUTIONS.

### A.   Plaintiffs' proposed resolution.

Plaintiffs request that the Court require NMAC to produce its documents in the form that they are ordinarily maintained (native format) wherever possible.  And when delivery in that form is not possible, request that the Court order counsel to meet and confer to arrive at an agreed format for the following.

### 1.   Request 49

Plaintiffs propose that NMAC provide the requested data for all its outbound calls, without regard to the intended recipient.  Plaintiffs will undertake to identify the subscriber of the phone line using both subpoenas to cellular carriers, and reverse append services.  This process should identify both the true owner as well as the customary user of any cell phone number.  Plaintiffs agree to maintain this information as "CONFIDENTIAL" for purposes of the protective order entered in this case and will agree to additional limitations set by the Court concerning the use of information relating to individuals identified as actual NMAC customers.

To the extent that NMAC believes it would be an undue burden to have to assemble the data compilation from its various sources such as the SIEBEL database, the DAT files, and the PBX Logs, Plaintiffs will agree to accept the available data in the form in which it is ordinarily maintained (*see* Fed. R. Civ. P. 34(e)) and Plaintiffs will compile the data using their own experts at their own cost. Again, Plaintiffs agree to maintain this information as "CONFIDENTIAL" for purposes of the protective order entered in this case and will agree to additional limitations set by the Court concerning the use of information relating to individuals identified as actual NMAC customers.

Alternatively, Plaintiffs will agree to the appointment of a Data Liaison to be appointed as a Special Master to the Court under Fed. R. Civ. P. 53.[36]  The purpose of that appointment would be to survey the data systems of NMAC, identify relevant data within the systems, determine the format in which data can be extracted, and identify any possible means -- either using NMAC's own data exclusively in conjunction with commercially available or subpoenaed information – of reasonably identifying the class members.

**Request 51** – Plaintiffs believe that this information is reasonably available and relates to both an element of the claim and willfulness.  As such, the Court should compel production.

**Request 52** – This information seek evidence of consent with is NMAC's affirmative defense to the claim.  The Court should require NMAC to produce all information concerning proof of consent in the form used by NMAC, or require NMAC to forfeit its defense.

**Request 53** – NMAC's Manager of Predictive Dialing, Matt Ramsey, has access to and manages the rules for predictive dialing and the delivery of prerecorded messages.  These instructions are relevant to the claims at issue, as well as the calculation of damages.  As such, the Court should require NMAC to produce responsive documents.

**Request 54** – NMAC has possession of all source materials necessary to respond to request 49.  These original materials include the DAT Log, the PBX Log,

---

[36] Several other courts have adopted ESI protocols which include the designation of ESI liaisons by the parties.  These courts include Seventh Circuit (Model Standing Order  2.02); Northern District California (Guidelines for the Discovery of Electronically Stored Information 2.05); District of Delaware (LR 7026-3); Eastern Michigan (EDiscovery Principle 2.02).  See generally, Colorado (Guidelines Addressing the Discovery of Electronically Stored Information)

and the SIEBEL Database.  NMAC regularly handles these files and can download them as needed.  The Court should require NMAC to produce responsive ESI.[37]

**Requests 56 and 57** – NMAC has failed to properly assert any claims of privilege and therefore waived those objections.  Any internal compliance audits would demonstrate notice of the need for a compliance regimen and would therefore bear on the issue of willfulness.   The Court should order NMAC to produce any responsive documents.

**Request 60** – NMAC's organizational chart is readily available on NMAC's Q: drive, per the testimony of NMAC's witnesses.  The Court should order NMAC to produce this document.

**Request for Inspection** – If NMAC is unable or unwilling to produce the requested data itself, Plaintiffs' counsel are ready to fly to Dallas, Texas with their experts to inspect NMAC's systems and extract the data themselves. NMAC's witnesses have identified multiple data sources as being readily available for extraction, including the DAT Log, the PBX Log, and the SIEBEL Database, all of which contain information relevant to establishing Plaintiffs' claims. Plaintiffs would work with those most knowledgeable within NMAC to ensure the integrity of NMAC's systems and data during the extraction process.

**B.     NMAC's Proposed Resolution (as to Plaintiffs' Request for Inspection).**

Apparently as an afterthought to their lengthy motion to compel, and with little discussion or analysis, Plaintiffs argue that they should be allowed to physically inspect NMAC's Siebel and other systems, and to extract data from those systems of record if NMAC is unable to do so itself.

---

[37] To the extent that NMAC believes that the log files have not been described with sufficient specificity, Plaintiffs have requested delivery of these files by these names on August 18, 2017 along with a 2 terabyte hard drive, which is sufficient to deliver responsive files.

There are multiple, insurmountable problems with this proposal, and the Court should decline to order that this take place pursuant to Plaintiffs' "inspection" demand.

First, allowing this would raise serious technical, security and data integrity issues which would expose both NMAC and its customers to an almost unimaginable risk of loss. The sampling and extracting of data as proposed by Plaintiffs necessarily entails accessing customer information that is housed in NMAC's servicing system.[38]   NMAC is subject to stringent regulations for the protection of its customers' private financial information.[39]   NMAC is also responsible for the management of its customers' data by third parties.[40]

For these reasons NMAC employs thorough and comprehensive security measures to protect its customers' data, including but not limited to background and security checks,  education verification, Social Security number verification, employment, drug testing, skills testing, and criminal checks.[41]   NMAC also employs strict requirements for the use of technology to access its computer and data systems.[42]   All of these measures are designed to prevent against the intentional, or unintentional, improper disclosure of customer data.  To protect itself against such improper disclosure or damage to its data, NMAC requires that vendors and contractors provide it with extension insurance coverage.[43]   The very recent public disclosure of a data breach at Equifax provides a solemn reminder of the

---

[38] NMAC Dec. ¶5.

[39] NMAC Dec. ¶¶12, 13.

[40] Consumer Fin. Prot. Bureau, CFPB Bull. No. 2012-03, *Service Providers* (Apr. 12, 2012); Consumer Fin. Prot. Bureau, CFPB Compliance Bull. No. 2015-01, *treatment of Confidential Supervisory Information* (Jan. 27, 2015).

[41] NMAC Dec. ¶¶14-16, 21.

[42] NMAC Dec. ¶¶17-19.

[43] NMAC Dec. ¶20.

1 seriousness of this issue and what is at stake both for consumers and the businesses

2 that are obligated to safeguard their information. See

3 http://www.latimes.com/business/technology/la-fi-tn-equifax-data-breach-

4 20170907-story.html

5       Second, Plaintiffs' sampling and extraction request is so burdensome that it

6 requires completely shutting down NMAC systems and therefore preventing it from

7 operating its business.   The financial cost of such a shutdown would be

8 astronomical. For example, to extract the Siebel data for 5.1 million accounts would

9 require shutting down that system for over 60 days.[44]   During this two month period

10 NMAC would not be able to access or document its customers' accounts.[45]

11       To extract the five years' of  requested data from the Cisco and Genesys

12 OCM components  would require that the Cisco dialing component be shut down for

13 at least 56 hours.[46]   During the shutdown agents would not be able to utilize the

14 dialing component for outbound calls or NMAC would not be able to route inbound

15 calls for servicing customer accounts.[47]   Even the Service Request extraction

16 requests would each shutdown Siebel for 24 hours.[48]   As explained in NMAC's

17 declaration, the extraction of the Service Requests alone will not provide the

18 information sought.  Information would also have to be extracted from the Siebel

19 database, with a shutdown time of at least 60 days.  Any one of the extractions, let

20 alone the combined effect, is burdensome and should be denied by this Court.[49]

21

---

22 [44] NMAC Dec. ¶¶25-31.

23 [45] NMAC Dec. ¶30.

24 [46] NMAC Dec. ¶33.

25 [47] *Id.*

26 [48] NMAC Dec. ¶¶39, 40.

27 [49] *See Bill v. NCO Financial Systems, Inc*., 2015 WL 5715402, at *2 (M.D.Fla., 2015) (finding inspection of call center unduly burdensome where information

28 resided in a "secure, non-public location[] that contain[ed] sensitive and valuable

Finally, allowing access to data pertaining to millions of NMAC customers would violate their rights to privacy, which NMAC is obligated to protect under the Gramm-Leach Bliley Act ("GLBA").  *See* 15 U.S.C. §§ 6801-6809.  Pursuant to the GLBA, NMAC is prohibited from "disclos[ing] to a nonaffiliated third party any nonpublic personal information" relating to its customers.  15 U.S.C. § 6802(a). Among other things, the nonpublic personal information that may not be disclosed includes a customer's telephone number.[50]

-----------------------

private information of third-party customers" and where the inspection "would unnecessarily disrupt Defendant's business operations by requiring supervision and assistance by Defendant's employees during the inspection to open databases, monitor Plaintiff's counsel, and oversee the inspection to ensure that third-party consumer data is not divulged and that its equipment is not damage.");  *accord Al-Zaharnah v. Innovative Loan Servicing Company*, 2015 WL 5897685, at *2 (M.D.Fla., 2015) ("Plaintiff contends that a site inspection of Defendant's call center to examine the equipment used by Defendant in making calls to consumers is necessary for Plaintiff to meet his burden of establishing that Defendant used an ATDS to call Plaintiff's cell phone and to refute Defendant's defense that it did not use an ATDS.  However, the Court finds that the burden of the requested discovery outweighs its likely benefit"); *Walker v. Credit Protection Ass'n, LP*, 2015 WL 5522000, at *3-4 (M.D.Fla.,2015) ("Plaintiff contends that an on-site inspection of Defendant's call center is necessary for her to meet her burden of establishing that Defendant used an ATDS to place calls to Plaintiff's phone and to refute Defendant's defense that it did not use an ATDS. Defendant, though, has stated to Plaintiff and the Court that "it is willing to stipulate for purposes of this case only, that it will not assert as a defense as to whether the phone system used to place calls to plaintiff constitutes an ATDS." Therefore, given this stipulation, the relevance of Plaintiff's request is marginal at best. . . .Additionally, Defendant's telephone system and related software contain non-public information regarding third parties").

[50]  As explained by the Federal Trade Commission:

> Many companies collect personal information from their customers, including names, addresses, and *phone numbers*; bank and credit card account numbers; income and credit histories; and Social Security numbers. The Gramm-Leach-Bliley (GLB) Act requires companies defined under the law as "financial institutions" to ensure the security and confidentiality of this type of information.

1   The GLBA does provide an exception to the prohibition on disclosure of
2   nonpublic personal information where disclosure is necessary to respond to a
3   *subpoena* or other *judicial process*.   *See* 15 U.S.C. § 6802(e)(8).   However, the
4   judicial process exception does not broadly apply to any and all information a
5   litigant might seek by subpoena or other judicial process.   Rather, courts have
6   applied the exception only when the information sought by the subpoena or other
7   judicial process is *relevant* to the proceeding.[51]

8   Plaintiffs argue that NMAC's objections under the GLBA lack merit because
9   the Court previously overruled NMAC's objections under the GLBA in denying its
10  motion to quash Plaintiffs' subpoena to third-party Verizon Communications, Inc.
11  However, the Court denied NMAC's motion on the grounds that NMAC "failed to
12  show that the GLBA vests it with a privacy interest in the information at issue that is
13  sufficient *to confer standing to challenge the subpoena served on a non-party*."
14  [Dkt. 62 at p. 5 (emphasis added)]   The primary issue there was thus "standing, not
15  the propriety of the [discovery request]."   [*See* Dkt. 62 at p. 5, fn. 1, & p. 6]

16  Here, on the other hand, there is no question that NMAC has standing to
17  challenge Plaintiffs' requests, the compliance of which would require NMAC to
18  *disclose its own customers' nonpublic personal information*.   *See* 15 U.S.C. §§

---

20  Federal Trade Commission, *Financial Institutions and Customer Information:*
21  *Complying with the Safeguards Rule*, https://www.ftc.gov/tips-advice/business-center/guidance/financial-institutions-customer-information-complying (last
22  visited May 15, 2017) (emphasis added).

23  [51] *See*, *e.g.*, 5 A.L.R. Fed. 2d 497 (emphasis added):

24  "The GLBA provides exceptions to its notification and opt-out procedures,
25  including when disclosure is necessary to respond to judicial process. The
    court in *Martino v. Barnett*, 215 W. Va. 123, 595 S.E.2d 65, 5 A.L.R. Fed. 2d
26  745 (2004), held that the judicial process exception allows the use of any
    judicial process expressly authorized by statute or court rule, whether by way
27  of discovery or for any other purpose expressly authorized by law, to obtain
28  information *relevant to the proceeding*."

6801(a), 6802(a).  Rather, the issue here concerns the substance of the requests—i.e., whether the requests seek information protected under the GLBA.

Disclosure of customers' and third parties' identities, contact information, account and dispute details would significantly impact their right to privacy.  Such personal financial matters are protected by the right to privacy.  *See, e.g., In re Crawford*, 194 F.3d 954, 957-59 (9th Cir. 1999).  These rights are particularly significant as Plaintiffs have made no showing that the third-party customers are putative class members.  When it comes to sensitive third party financial information protected by the right of privacy, a litigant simply cannot miss.  The harm attendant to the third parties in ordering production of their private financial information far outweighs any the assistance to Plaintiffs' claims.  *See, e.g., Tech v. United States*, 284 F.R.D. 192, 207 (M.D. Pa. 2012) (denying on overbreadth, privacy, and burden grounds motion to compel information re putative class members).  As such, the Court should deny the motion on this basis alone.

## VIII.  CONCLUSION

### A.    Plaintiffs' position

NMAC continues to approach discovery in this matter like a game of Battleship, refusing to produce any class data that does not precisely match the form in which that data has been gathered and stored to exclude any possibly unrelated material.  At the same time, NMAC has refused to provide access to the system so that Plaintiffs may identify the precise data available, and will not provide access to any individual (either informally or as a deposition witness) with actual information concerning the data in their system.[52]  Plaintiffs request the assistance of the Court to compel NMAC to compile and produce the data within their own systems which will allow Plaintiffs to identify the admittedly numerous class members who received autodialed calls and prerecorded messages.  Alternatively, Plaintiffs

---

[52] See Plaintiff's accompanying motion to compel a responsive 30(b)(6) Witness.

1   request that the Court allow Plaintiffs access to the system or individuals who are
2   knowledgeable with the system so that the data can be compiled and extracted by
3   Plaintiffs.

      **B.**     **NMAC's Position - Not applicable under Local Rule 37-2but see discussion in Sections VI.B. and VII.B above.**

**STIPULATED TO BY**

DATED:  September 11, 2017     KEMNITZER, BARRON & KRIEG


By: _____*/s/ Bryan Kemnitzer*_____
             Bryan Kemnitzer

Attorneys for Plaintiffs
ARAM TERTERYAN, TATYANA
DAVTYAN, and MARINE DAVTYAN


DATED:  September 11, 2017     SEVERSON & WERSON
                       A Professional Corporation


By: _____*/s/ Genevieve R. Walser-Jolly*_____
          Genevieve R. Walser-Jolly

Attorneys for Defendant
NISSAN MOTOR ACCEPTANCE
CORPORATION